UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAUM RESEARCH AND
DEVELOPMENT COMPANY, INC., et
al.,

    Plaintiffs,                                       Hon. Ellen S. Carmody

v.                                                   Case No. 1:02-cv-00674

UNIVERSITY OF MASSACHUSETTS
AT LOWELL, et al.,

    Defendant.
_____/

## OPINION

This matter is before the Court on Plaintiffs' <u>Renewed Motion for Partial Summary Judgment Relating to Breach of Contract</u>, (Dkt. 110), Plaintiffs' <u>Renewed Motion for Summary Judgment Relating to Patent Infringement and Injunction</u>, (Dkt. 110), and Defendant's <u>Renewed Motion for Summary Judgment</u>, (Dkt. 115). On February 7, 2003, the parties consented to proceed before the undersigned for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c)(1). By order of Reference, the Honorable Richard Alan Enslen referred this case to the undersigned. (Dkt. 16). Oral argument was heard on these motions on June 7, 2005. For the following reasons, Plaintiffs' renewed motion for partial summary judgment relating to breach of contract, Plaintiffs' renewed motion for summary judgment relating to patent infringement and injunction, and Defendant's renewed motion for summary judgment are **denied**.

## BACKGROUND

Plaintiff Baum is the inventor of the Baum Hitting Machine ("BHM") (United States Patents, Nos. 5, 988, 861 and 6, 640, 200). The BHM is the first machine to simulate "the bat-ball collision" to "accurately measure the speed of a baseball hit by a baseball bat." (Dkt. 110). In July 1998, the National Collegiate Athletic Association ("NCAA") accepted the BHM "as the test apparatus that the NCAA would use to certify aluminum and composite bats for collegiate baseball." (Dkt. 118, Exh. 4). To maintain uniformity, the certification testing is performed according to a predetermined testing protocol, "a methodology for testing baseball bats using the [BHM] in a coordinated and calibrated manner for Compliance Testing."[1] (License Agreement, at I-4). Baseball Bat manufacturers have a strong business interest in the testing protocol because if their bats fail NCAA certification testing under the testing protocol, such bats will be banned from NCAA play.

On December 24, 1998, Plaintiffs and Defendant executed a License Agreement involving Defendant's purchase and use of one of the two BHMs in existence. (License Agreement). Under the License Agreement, Plaintiffs granted Defendant a "paid-up, non-exclusive license" to use the purchased machine. *Id.* at II-4.

The contract gave Defendant authority to perform "non-commercial testing" at its Baseball Research Center, the official certification center for major league baseball and the NCAA. *Id.* at II-4. "Non-commercial testing specifically exclude[d] direct or indirect testing for baseball equipment manufacturers and other commercial entities, whether for-profit or not-

---

[1] In the License Agreement, "compliance testing refers to LICENSEE'S non-commercial use of the Purchased Machine to test a given bat using the Test Protocol." (License Agreement, at I-10).

- 2 -

for-profit." *Id*. at I-12.  However, in the event that Plaintiffs could not, or would not, perform such testing, Defendant could request a "one-time license" to perform the testing.  Plaintiffs could not "unreasonably" withhold permission for such requests and were required to confirm such permission in writing.  *Id*. at II-4.

In addition, the License Agreement required both parties to use the testing protocol included therein.  *Id.* at I-4.  However, in the event that changes or improvements to the testing protocol's methodology were to be made, the existing testing protocol could be changed as long as Plaintiffs were "consulted with as to the rationale of such protocol changes prior to their implementation."  *Id*. at II-7.  Also, the License Agreement prohibited Defendant from making physical alterations to the purchased BHM "in any manner without Baum's advanced written permission, with the understanding that such permission [would] not be unreasonably withheld by Baum."  *Id*. at II-8.

If either party committed a material breach of its duties under the License Agreement and failed "to cure within thirty days (30) after receiving written notice of its breach," the non-breaching party could terminate the contract "immediately upon written notice to the party in breach."  *Id*. at II-14.  In the event that Plaintiffs had properly terminated the License Agreement, Defendant would be allowed to keep the purchased BHM, "though the license to use the same [would] cease."  *Id.*

In November 1999, Plaintiffs sent Defendant a written notification, stating that Defendant materially breached the License Agreement.  Plaintiffs asserted that Defendant failed to comply with several provisions of the License Agreement, emphasizing Defendant's failure to: (1) perform only permissible "non-commercial" testing and (2) consult with Baum prior to

making any changes to the testing protocol. Defendant has asserted that it did not materially breach the contract because: (1) Plaintiffs violated the License Agreement by unreasonably withholding Defendant's request for permission to perform the commercial testing; (2) Baum was consulted as to the testing protocol changes prior to their implementation; and (3) in the alternative, even if it had materially breached, Defendant fully cured in a timely manner as provided in the License Agreement. In any event, Plaintiffs initiated the present action seeking damages for breach of contract and patent infringement, as well as injunctive relief.

## SUMMARY JUDGMENT STANDARD

In reviewing a motion for summary judgment, the Court must confine itself to the narrow questions of whether there exist "no genuine issue[s] as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a Rule 56 motion, the Court cannot try issues of fact, but is empowered to determine only whether there exist issues in dispute to be decided in a trial on the merits. *See Perez v. Aetna Insurance Co.*, 96 F.3d 813, 819 (6th Cir. 1996); *Aiken v. The City of Memphis*, 37 F.3d 1155, 1161 (6th Cir. 1994). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also*, *Terry Barr Sales Agency v. All-Lock Co. Inc.*, 96 F.3d 174, 178 (6th Cir. 1996) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989)).

A motion for summary judgment requires the Court to view "inferences to be drawn from the underlying facts...in the light most favorable to the party opposing the motion."

*Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also*, *Terry Barr Sales Agency*, 96 F.3d at 178; *Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 727 (6th Cir. 1996).  The opponent, however, has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir. 1989) (quoting *Matsushita Electric Ind. Co.*, 475 U.S. at 587); *see also*, *Schaffer*, 74 F.3d at 727.

As the Sixth Circuit has recognized, Supreme Court decisions have encouraged the granting of summary judgments, as such may be "an appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Kutrom v. City of Center Line*, 979 F.2d 1171, 1173 (6th Cir. 1992).  Consistent with this concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd Board of Education*, 106 F.3d 135, 140 (6th Cir. 1997).  Furthermore, mere allegations do not suffice.  *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989) ("the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact").

## ANALYSIS

**I.       Breach of Contract**

      A.       <u>The Language in the License Agreement is Ambiguous</u>

The parties in this action dispute the meaning of certain language in the License Agreement governing their contractual relationship. When the meaning of a contract is in dispute, the court's primary goal is to interpret the contract in light of the parties' intent. *Fleet Business Credit, LLC v. Krapohl Ford Lincoln Murcury Co.,* - - - N.W.2d - - -, 2004 WL 2179235 at *2 (Mich. App., Sept. 28, 2004). To ascertain the intent of the parties, the court must first look to the plain meaning of the language in the contract. *Id.*

Under Michigan law, an ambiguous contract raises a question of fact "as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract." *Klapp v. United Ins. Group Agency, Inc.,* 663 N.W.2d 447, 453 (Mich. 2003) (citing Williston, Contracts (4th ed.), § 30:7, pp. 87-91). The threshold question of whether the terms of a contract are ambiguous is a question of law. *Port Huron Ed. Ass'n. v. Port Huron Area School Dist.,* 550 N.W.2d 228, 237 (Mich. 1996). The Court may not create ambiguity where it does not exist. "A contract, even if inartfully worded or clumsily arranged, is not ambiguous 'if it fairly admits of but one interpretation.'" *Id.* at 236.

"A contract is ambiguous if its provisions may reasonably be understood in different ways." *Universal Underwriters Ins. Co. v. Kneeland,* 628 N.W.2d 491, 494 (Mich. 2001). Also, if one provision conflicts with another, the contract is ambiguous. *Klapp*, 633 N.W.2d at 453.

The following are the provisions subject to the parties' conflicting interpretations as to what constitutes permissible use of the BHM under the License Agreement:

I-9   "Academic Testing" refers to LICENSEE'S potential use of the Purchased Machine to perform non-commercial research and internal studies, in which case the Test Customer is the University of Massachusetts at Lowell.

I-10  "Final Certification and Compliance Testing" refers to LICENSEE'S non-commercial use of the Purchased Machine to test a given bat using the Test Protocol.

I-11  "Baseball Governing Body Testing" refers to LICENSEE'S non-commercial use of the Purchased Machine to perform testing for Major League Baseball and for non-profit organizations engaged in regulatory approval.

I-12  "Non-Commercial Testing" includes Academic Testing, Final Certification and Compliance Testing, and Baseball Governing Body Testing.  <u>Non-Commercial Testing specifically excludes direct or indirect testing for baseball equipment manufacturers and other commercial entities, whether for profit or not-for-profit.</u>

(License Agreement, <u>emphasis added</u>).

Upon review of the plain meaning of "I-9" through "I-12," the Court finds ambiguity regarding permissible testing under the License Agreement.  *Id.*  All four definitional terms use the phrase "non-commercial," but fail to identify what types of testing constitute "non-commercial" testing.  *Id.*  Presumably, a reasonable person can interpret the phrase "commercial" to mean a sale of goods or services in exchange for profit, and "commercial testing" to mean testing done in exchange for profit.  *Id.*  However, according to "I-12," such an interpretation is incorrect.  *Id.*  "I-12" states, "non-commercial testing specifically excludes direct or indirect testing <u>whether for profit or not-for-profit</u>."  *Id.*  Therefore, under the License Agreement, such testing, including some "not-for-profit" testing, is actually commercial in nature.  *Id.*  The

remaining language in "I-12" offers no additional assistance in the interpretation of what constitutes permissible "non-commercial" testing. *Id.*

Even assuming "non-commercial testing" is unambiguous, though it is not, provision "I-11," which permits "non-commercial" testing for "Baseball Governing Bodies," fails to adequately identify what types of "governing bodies" are included. *Id.* The provision merely states "non-commercial" testing is permissible if performed for either "Major League Baseball" or a "non-profit organization engaged in regulatory approval." *Id.* The description, in itself, invites a variety of reasonable interpretations. What constitutes an entity "engaged in regulatory approval" is an unanswered question in the License Agreement which reasonable minds could interpret differently, as the parties have in this case.

The ambiguity in the License Agreement is clearly illustrated by the parties' reasonable, though different, interpretations of the contractual language. For example, according to Plaintiffs, permissible "non-commercial" testing was explicitly identified in the contract as constituting only "Final Certification and Compliance testing of bats manufactured by companies...to determine if they complied with the rule-mandated speed restrictions imposed by the NCAA." (Dkt. 110). Plaintiffs described this as an "explicit restriction," which prohibited Defendant from using "the BHM as a commercial test-bed" and engaging "in pre-certification testing for bat companies." *Id.* In contrast, Defendant alleged the definition of "non-commercial" testing was "not exclusive" to the explicit language in the License Agreement. (Dkt. 122). According to Defendant, it was allowed to perform "Non-Commercial testing, other than those specifically defined" in the contract, including "non-commercial testing for entities other than those specifically named in the Agreement." *Id.*

The parties dispute the nature of four discrete instances of testing: (1) NCAA/Easton[2]; (2) NCAA Wood Swing testing[3]; (3) the Brett Legal Case[4]; and (4) Worth testing[5]. Though this list does not exhaust Plaintiffs' allegations of prohibited testing, the Court finds it adequately illustrates that the two parties reasonably interpreted the contractual language differently. Despite the presumption that both parties thought they understood the context of the License Agreement upon its execution, the obvious discrepancies in the parties' understanding signifies ambiguity in the contractual language. Thus, there are numerous disputes as to the meaning of the contract, which the Court cannot resolve as a matter of law.

### B. A Factual Question Exists as to Whether Plaintiffs' Withholding Permission for Admitted Prohibited Testing was Unreasonable

The Court also finds there is a factual question of whether Plaintiffs' alleged withholding of permission for admitted prohibited testing was unreasonable. The License Agreement provides: "In the event that Baum cannot, or will not, perform a commercial test, and LICENSEE desires to perform the test, Baum may grant a one-time license to LICENSEE to

---

[2] Plaintiffs argued the NCAA/Easton testing was commercial in nature because Easton, an aluminum bat manufacturer, funded the testing for reasons relating to its ongoing litigation with the NCAA. Defendant alleged the NCAA/Easton was non-commercial testing because it constituted permissible final certification testing and Easton's payment was merely a charitable donation to the NCAA.

[3] The parties dispute whether provision "I-11" included the NCAA as a "Baseball Governing Body." (License Agreement).

[4] The parties disagree as to whether the testing performed for the Brett Legal Case constituted permissible "academic" testing under provision "I-12." *Id.*

[5] Plaintiffs argued the $50,000 Defendant received from Worth, an aluminum bat manufacturer, was payment for unauthorized commercial testing. Defendant claimed "the funds were paid as part of a blanket purchase order for future [commercial and non-commercial] testing," and thus only a portion of the payment was made towards commercial testing. (Dkt. 122).

perform the test. Baum's permission to perform the test will not be unreasonably withheld, and will be confirmed in writing."[6] (License Agreement, at II-4). The parties dispute whether Defendant requested permission to perform prohibited commercial testing. Defendant asserted that in September 1999, Professor Sherwood verbally requested permission from Charles Baum for each instance of admitted unauthorized testing.[7] Plaintiffs refuted this allegation, pointing out Defendant's inability to prove that such verbal communications took place. However, even assuming Defendant requested permission, the parties dispute whether Plaintiffs "unreasonably" withheld granting Defendant's request to perform the testing. According to Defendant, none of the manufacturers would have done business with Plaintiffs in any event. Plaintiffs make the point that if the only available testing machine was Plaintiffs', they would have had no choice. As such, whether Plaintiffs "unreasonably" withheld permission raises a factual dispute, which this Court cannot resolve as a matter of law.

### C. A Factual Question Exists as to Whether Defendant Consulted With Baum About the Testing Protocol Changes Prior to Their Implementation

The Court finds also that there is a factual question as to whether Baum was advised of the testing protocol changes prior to their implementation in September 1999. According to the License Agreement, Defendant was permitted to change the testing protocol as long as it consulted Baum, prior to the implementation of such changes, as to the rationale behind the change. (License Agreement, at II-8). Charles Baum claimed Defendant failed to notify him

---

[6] The contract is unclear as to who will give written confirmation.

[7] Defendant admitted to performing "prohibited" testing for three aluminum bat manufacturers: (1) Worth; (2) Ainsworth; and (3) DeMarini.

before the testing protocol was changed in September 1999. In deposition, Professor Sherwood alleged he informed Baum of the scientific reasoning behind the upcoming protocol change during certain verbal communications in the fall of 1999. Plaintiffs argued that no such communications took place. The question of whether Baum was consulted before the 1999 protocol change raises an issue of material fact, which the Court cannot resolve as a matter of law.

### D. A Factual Question Exists as to Whether Defendant's Alleged Cure Was Reasonable

Even assuming the License Agreement is unambiguous, which it is not, the Court finds a factual question as to whether the Defendant's conduct fully cured its alleged material breaches of the License Agreement. The relevant provision in the License Agreement states, when "either party commits a material breach of its obligations under this Agreement and fails to cure that breach within thirty (30) days after receiving written notice thereof, the other party may terminate this Agreement immediately upon written notice to the party in breach." (License Agreement, at I-14). The Court has found no controlling case law as to what constitutes reasonable "cure" under the circumstances of this case. In any event, since the License Agreement fails to describe what constitutes cure, it leaves a factual dispute over Defendant's alleged cure.

Defendant first argued there was no breach because there was no injury to cure. Defendant alleged Plaintiffs could not have performed at least some of the alleged commercial testing since they were either in litigation or competition with the manufacturers for whom

Defendant performed testing. Plaintiffs refuted this claim by providing evidence of previous transactions with such manufacturers, which took place when Plaintiffs operated the only testing facility.

In the alternative, Defendant argued if it had breached, it cured by: (1) offering to pay Plaintiffs the money it received for admitted prohibited testing and (2) refraining from any further prohibited testing. During oral argument, Plaintiffs responded by arguing that Defendant could not cure its breach because the language in the cure provision was boilerplate. Plaintiffs claimed that "once Sherwood and UMass decided to breach...there was no possibility of curing that breach by 'paying back' the money it received from the aluminum bat companies. The damage done by letting them test in the first place was already done." (Dkt. 125). Moreover, Plaintiffs argued that, even if Defendant had the opportunity to cure, its attempt was insufficient because the extent of their injuries far exceeded the amount offered by Defendant. Plaintiffs alleged the breach caused them to lose: (1) large sums of profit it would have received from BHM testing and BHM sales, in addition to (2) the opportunity of being one of the only (or only) manufacturers of NCAA certifiable baseball bats. Furthermore, Plaintiffs argued that no evidence exists that UMass or Sherwood ever reverted back to the original protocol.

One reason that the Court rejects Plaintiffs' argument that the cure provision in the License Agreement is irrelevant because Plaintiffs explicitly acknowledged Defendant's opportunity to cure in its letter giving notice to the Defendant of its breach: "Pursuant to the contract, there remains 30 days to correct these breaches." (Dkt. 115, Exh. F). In any event, the issue of whether Defendant cured its alleged breach clearly requires a factual determination as to the extent of Plaintiffs' injuries caused by the alleged breach of the License Agreement. The

Court finds, even assuming the License Agreement is clear and unambiguous as to other issues, there still remains a factual question as to what constitutes cure under the contract.

## II.        Patent Infringement and Request For Injunction

Plaintiffs request summary judgment for its Patent Infringement and Injunctive Relief claims that were bifurcated as of February 9, 2004. In addition, this issue was recently addressed by the Court during its May 5, 2005 telephone conference with the respective parties. Defendant argued the Court had "informed Plaintiffs that it would not revisit the issue of bifurcation." (Dkt # 122). Defendant is correct. The parties had discussed the bifurcation issues extensively with the Court before the case was bifurcated. Furthermore, it is clear that Defendant relied on its understanding that the patent claims would not be presently revived because it failed to conduct discovery or retain patent experts with respect to the bifurcated claims. Nor was a typical preparation for a patent case undertaken. The Court concludes that the bifurcated patent infringement claims are improperly before the Court at this time.

## CONCLUSION

For the reasons discussed herein, the Court determines the following:

(1) Plaintiffs' renewed motion for partial summary judgment relating to breach of contract is **denied**; (2) Plaintiffs' renewed motion for summary judgment relating to patent infringement and

injunction is **denied** without prejudice; and (3) Defendant's renewed motion for summary judgment is **denied**.  An Order consistent with this Opinion will enter.

Date:  June 17, 2005                                                      /s/ Ellen S. Carmody            
                                                             ELLEN S. CARMODY
                                                             United States Magistrate Judge